No.——

First Circuit

HOLMES & BARNES v. SHAWNEE MILLING CO.

BANK OF TOPEKA, Intervenor.

(Dec. 7, 1926. Opinion and Decree.)

*(Syllabus by the Editor.)*

(ON REHEARING.)

1. **Louisiana Digest—Banks and Banking —Par. 68.**

A bank which credits the amount of the draft to the depositor and permits him immediately to draw against it becomes the owner of the draft and bill of lading attached by implication, although the bank reserves the right

to charge back the amount in case the draft is not paid.

**2. Louisiana Digest—Banks and Banking —Par. 68.**

The deposit slip used by a bank on which there is a printed statement that the bank receiving the check or draft "acts only as agent, etc.", yields to and is governed by the proved intention of the parties that the bank, in effect, purchased the draft with bill of lading attached by allowing the depositor to draw the face value of the draft.

**3. Louisiana Digest—Bills and Notes— Par. 117.**

Where the drawer and payee of a bank deal with each other in Kansas, the right of the payee is fixed by the law of that state even though enforcible in Louisiana courts.

**4. Louisiana Digest—Evidence—Par. 44.**

The law of Kansas applicable to a suit in Louisiana courts when not proven will be presumed the same as in Louisiana.

**5. Louisiana Digest—Bills and Notes— Par. 138.**

In view of Articles 1916, 2439, 2456 and 2481 of the Civil Code, the delivery of a draft with bill of lading attached to a bank with the consent of the party with whom it was obtained and paid for by the bank crediting the amount of the draft has all the essentials of a sale.

Appeal from Parish of East Baton Rouge. Hon. Wm. Carruth Jones, Judge.

Action by Holmes & Barnes against Shawnee Milling Co. and Bank of Topeka, intervenor.

There was judgment for plaintiff and intervenor appealed.

Judgment affirmed, but on rehearing former judgment set aside and judgment re-served and rendered in favor of intervenor.

Taylor, Porter, Loret & Brooks, of Baton Rouge, attorneys for plaintiff, appellee.

Laycock, Borron & Laycock, attorneys for intervenor, appellant.

## ON REHEARING.

ELLIOTT, J.     Our former opinion and decree, concerning the rights of Holmes & Barnes, Ltd., seeking to enforce the payment of a debt due them by Shawnee Milling Co., by attaching the proceeds of a draft drawn by Shawnee Milling Co. upon them, in favor of Bank of Topeka, has not changed. Their right is fixed by that of Shawnee Milling Co., it is no greater than that of their debtor.

We also contend, in our former opinion, that the alleged error in the draft has not been established. It was drawn by P. E. Tally, bookkeeper for Shawnee Milling Co., and can not be reformed for error, even if such existed on the part of the payee, if there was none on part of the drawer.

But we have come to the conclusion, after re-examination of the law and the evidence on the subject, that Bank of Topeka was the owner and possessor of the draft at the time it was paid as the result of a previous purchase and delivery made at Topeka, Kansas.

H. D. Wolf, cashier, and H. W. Bowman, Jr., teller of Bank of Topeka, both testify that their bank purchased the draft and bill of lading attached. Mr. Tally, bookkeeper of Shawnee Milling Co., does not say whether the draft was purchased or not, he states what was done and leaves it for the courts to decide whether or not a purchase resulted. The testimony of Mr.

Wolf and of Mr. Bowman is supported by the deposit slip, showing how the draft was received in their bank, and the general course of dealing on the part of Bank of Topeka and Shawnee Milling Co. and their relative situations, as regards each other at the time. The deposit slip, which includes the draft in question, shows that Shawnee Milling Co. deposited it in Bank of Topeka as cash. The word "cash" is not used on the deposit slip, but that was the effect immediately given to and received as a result of what was done. The evidence shows that Shawnee Milling Co. received the equivalent of cash, on the day the deposit was made, by means of checks which it drew against the deposit and which were paid.

The draft says on its face "for collection", and at the bottom of the deposit slip, the following appears in print "checks lost in transit or on which payment is refused, will be charged back to depositor's account, this bank acting only as agent and assuming no responsibility beyond due diligence on its part". These words in the draft and printed statement on the deposit slip is the main ground, supporting the claim of Holmes & Barnes, Ltd., that the draft when paid was the property of Shawnee Milling Co.; but we have come to the conclusion that these words in the draft and the printed statement on the deposit slip are not the controlling factors in the matter of ownership and possession at the time the draft was paid. The draft was also endorsed by Bank of Topeka for collection, but that form of endorsement was necessary, on account of the form in which the draft had been drawn. As for the printed statement on the deposit slip, that the bank receiving the check "acts only as agent, etc.", that yields to and is governed by the proved intent of the parties to the contrary at the time the slip was made, showing that the parties to the slip, did in effect and in fact, intend and perfect at the time, a sale and delivery of the draft and bill of lading attached. The evidence shows that the draft was drawn and taken with bill of lading attached, to Bank of Topeka, for the purpose of having it cashed and the proceeds credited to Shawnee Milling Co., to the end, that the credit might be drawn out that day. P. E. Tally, bookkeeper for Shawnee Milling Co., testified that he did not know what arrangements, if any, had been made on the subject; but that Bank of Topeka, credited Shawnee Milling Co. with the draft, along with other drafts, and that the credit thus created was used as a checking account. That Bank of Topeka charged Shawnee Milling Co. interest and exchange on credits thus given, until the drafts were actually paid. That this draft was taken to Bank of Topeka for the purpose of having the proceeds credited to the account of Shawnee Milling Co., which was done. That the whole amount of the deposit was actually drawn out by Shawnee Milling Co. The deposit slip bears date June 27, 1924. The account of Shawnee Milling Co., with the Bank of Topeka, on the morning of that day, shows that it was overdrawn to the extent of $12,064.67. That Shawnee Milling Co., during that day, deposited in the bank $4,910.35 which included the draft drawn on Holmes & Barnes, Ltd., and checked out $4,511.00, which left the account overdrawn to the amount of $11,654.43, and shows that the overdraft continued daily until June 30th, when it stood $13,719.42.

We think that the effect of this actual credit given and received at the time, on account of the draft, the existing and continuing overdraft and the course of dealing between the parties to the deposit

slip, establishes between them a purchase of the draft and bill of lading by implication. That Shawnee Milling Co., having drawn the draft for the purpose of depositing it to its credit as cash and having actually deposited it and received cash for it, corresponding to the credit given, that it, in effect sold and delivered the draft and bill of lading attached to Bank of Topeka and divested itself of right and title to the proceeds; vesting same in the bank.

The fact that the bank customarily charged interest on credits thus given to the drawer until the draft was actually paid, was not inconsistent with ownership and possession of the draft on part of Bank of Topeka.

The printed statement at the bottom of the deposit slip, that the check would be charged back if it was not paid and that the bank assumed no responsibility beyond due diligence, was not inconsistent with a purchase and delivery as between Bank of Topeka and Shawnee Milling Co., drawer and payee, because if the draft had not been paid, the Bank of Topeka would have had the right to charge it back, as a matter of law, provided there was no express agreement to the contrary. The only Louisiana case that we have found with apparent bearing on the questions in controversy is Louisiana Ice Co. vs. State National Bank. 1 McGloin 135, cited by plaintiff and relied on to show that the title of Shawnee Milling Co. was not divested by a deposit for collection; also supports the claim of Bank of Topeka, because it in effect, holds that if the depositor draws out the proceeds, he thereby makes the payee the owner and possessor of the draft for himself. The Supreme Court in Interstate Trust & Bankers Co. vs. Irwin, 138 La. 325, p. 336, 70 South. 313, referring to the contention of one of the parties said: "The defendant relies upon the doctrine that when a bank discounts a note and credits the maker with the proceeds, the bank is not a holder for value, unless the credit is absorbed by an antecedent debt, or until it is exhausted by withdrawal." The court did not pass on the doctrine, but speaks of it as if there was no objection to it on the part of the court.

In Burton vs. U. S., 196 U. S. 283, the syllabus reads in part:

"The deposit of checks in a bank and drawing against them by a customer, constitutes the relation of debtor and creditor, and the bank becomes the absolute owner of the checks so deposited, and not the agent of the customer to collect them. This relation is not, in the absence of any special agreement, effected by the rights of the bank against the customer and as liability therefor, in case the checks are not paid."

In that case, according to the report, the check did not have on its face the words "for collection" and the proceeds were not immediately checked out, but it holds that a check deposited and checked out in due course, creates the relation of debtor and creditor and makes the bank which received the check, the absolute owner of the same and not the agent of the depositor, for the purpose of collecting the check.

In Ruling Case Law, Vol. 3, Subject, Banks, pp. 524 and 525, Section 152, the entire section must be read to get the proper illustration which the author endeavors to give, but on account of its length we quote only a part of it as follows:

"If, on the other hand, there is a definite understanding at the time of the deposit, that such paper is deposited as cash, it is clear that the title passes to the bank. But where a check endorsed in

blank is deposited without any definite understanding as to the way it is to be treated, but is credited by the bank to the depositor as cash and is so entered on the depositor's cash book, the question frequently arises whether the title to the check passes immediately to the bank, or remains in the depositor. Prima facie, according to the weight of authority, the passing to the credit of the depositor of a check, bearing an endorsement, not indicating that it was deposited for collection, merely passes title to the bank. Still, according to the weight of authority, the rule above stated is not an absolute rule, is prima facie merely and yields to the intention of the parties, expressed or implied from the circumstances. * * * The intention of the parties as to the controlling factor may be shown in different ways and it would seem that the right accorded to the depositor, to draw upon the funds, is especially material as showing an intention that title should pass to the bank."

Section 261, pp. 682 and 633:

"* * * Also, as we have heretofore seen, when checks or drafts are deposited by a customer and are regarded by both parties as amounting to so much cash, the title to such paper passess immediately and the relation of debtor and creditor arises. The transaction is equivalent to a purchase of the check or draft by the banker and he becomes responsible to the depositor for the amount thereof. To produce this result however, it must appear that the check or draft was received as a deposit, to be treated as cash and that such was the intention of both parties. If it was deposited for collection merely, it is quite plain that the bank does not take title, but merely acts as agent for collection. The property in the check or draft remains in the depositor and the relation arising from the transaction is not that of debtor and creditor, but as principal and agent."

The subject is continued in Section 262, p. 634, and the author says that when a check or draft is credited as cash, it follows that the bank takes title to the proceeds immediately, upon crediting the

check or draft as cash. The checking out amounts to a receipt of the price and constitutes a purchase and delivery of the check or draft. The above language is supported by Commercial Bank of Pennsylvania vs. Armstrong, 148 U. S. 50.

Alexander vs. Birmingham Trust & Savings Bank, decided by the Supreme Court of Alabama, is cited by plaintiff as authority, that title to the draft remained in Shawnee Milling Co.; but in reality, the case supports the claim of Bank of Topeka. The report shows that it was an attachment suit, in which the attachment was maintained. The following excerpts are taken from the report, 16 A. L. R., pp. 1079, see p. 1081. "Indeed, there is no pretense that said bank became the purchaser of the draft," etc. And in the column opposite same page, Stone River National Bank vs. Lerman Mill Co., 9 Ala. App. 322, is cited, commencing at the bottom of the page and continuing on page 1082 as follows:

"Likewise, it appears that the deposit was conditional, as here, and it was held, that such an assumption of a conditional liability did not render the claimant bank, in fact, a purchaser of the draft, though formally, it might appear so. As pointed out in the opinion, the case would have been different, had the claimant bank actually purchased the draft, or had by agreement, credited the amount of it on a debt owed the claimant by the defendant. The deposit was conditional, with no pretense of a purchase and the mere fact that the drawer of the draft was at the time, indebted to First Naional Bank, to an amount in excess thereof, could have no material bearing on the result, in the absence of any agreement or understanding of any credit to be given on account thereof, or any pretense on the part of the bank, that credit was to be given or expected. Indeed the language used on the deposit slip, clearly indicates to the contrary. The First National Bank therefore, was but the agent of the Fisher Company, in the collection of the draft."

The court says in the case quoted, that the judgment would have been different if the bank and payee had actually purchased the draft, or had by agreement credited the amount of it on a debt owed the bank by the drawer.

Fourth National Bank of Montgomery vs. W. G. Bragg, decided by the Supreme Court of Virginia, II A. L. R., p. 1034, is very similar to the case we have in hand. It does not appear from the report that the draft involved in the case was deposited for collection; but it deals with a draft deposited as cash, passed into a checking account and was immediately checked out by the drawer, before the seizure of the proceeds. It seems that a man named Covington, drew a sight draft at Montgomery, Alabama, and with bill of lading attached, deposited same in Fourth National Bank of Montgomery, in which he had a regular checking account. The item, with others, deposited at the same time, was treated as cash and subjected to check. Covington made other deposits, checking against them, finally overdrawing his account. While this was going on, the draft proceeded on its way to the drawee, the Manchester Mills, at Richmond Virginia, and was paid as soon as it was presented. After payment, but on the same day, W. G. Bragg attached the proceeds at Richmond, upon which Fourth National Bank of Montgomery intervened, claiming the proceeds as owner, giving rise to the very question we have in hand in the case before us. The only difference being that the draft in the Virginia case does not appear to have had on its face the words "for collection". The court said p. 1036:

"The important question in this and in all similar cases is, whether it can be said that the draft with bill of lading attached, was taken by the bank in such a way as to constitute an assignment of and payment for the bill."

The opinion reviews and cites many authorities. The court agreed with two Alabama decisions, cited p. 1—41 to the effect that—"the controlling distinction is between a deposit for collection and an unqualified and unconditional deposit for credit and treated as cash. In one, the title remains in the depositor, in the other it passes to the bank." The syllabus, page 1034, reads in part:

"A bank which credits the amount of a draft to the depositor and permits him immediately, to draw against it becomes the owner of the draft and the bill of lading attached to it, although it reserves the right to charge back the amount in case the draft is not paid."

"When a bank takes an assignment of a bill of lading and pays the accompanying draft of the shipper for the value of the goods, the bank becomes a bona fide holder and no attachable interest in the goods or proceeds remains in the shipper." * * *

"The contract arising from the deposit of a draft in a bank, with the understanding that it may be checked against and charged back, if not paid, is to be construed by the law of the state, where the bank depositor resides and the draft was drawn, and not by that of the state of the drawee."

According to these Virginia and Alabama cases, the Shawnee Milling Co. draft, in favor of Bank of Topeka, though drawn for collection, having been immediately credited to Shawnee Milling Co. as cash, and the proceeds checked out before the draft was paid by Bank of Baton Rouge, the checking account of Shawnee Milling Co. being overdrawn at the time and continuing to be so, because the property of Bank of Topeka, as soon as it was received; the act of the parties, amounting to a purchase of the draft by implication.

Old National Bank of Spokane vs. Gibson, decided by the Supreme Court of Washington, 6 A. L. R. page 247, is a case almost parallel with the case we now have in hand. In that case E. J. Gibson drew a draft against his account in Fidelity National Bank in favor of J. A. White, a customer of the Old National Bank. White deposited it in Old National Bank for collection, but the deposit slip showed that White received immediate credit for it as cash. White checked out the proceeds immediately. When the draft reached Fidelity National Bank on which it was drawn, payment was refused; Gibson having stopped payment. Old National Bank then brought suit against Gibson to recover the amount, alleging that it had purchased the draft, upon which the questions we have in hand in this case were considered and decided by the court. The court says, pages 248 and 249:

"The contention is that * * *, White having received from the Old National Bank, the full amount of his balance, in reliance upon the check now in suit, then on deposit with it, the relation of principal and agent which had theretofore existed between White and the appellant bank, was terminated; that upon making such payment it ceased to hold the check for collection and became a holder in due course under the statute. The question then to be determined is whether having originally received the check as agent for collection, the bank, by honoring White's checks to an amount which entirely exhausted his balance, including the deposited check, thereby became a holder for value."

The court decided that Old National Bank becamse the owner and holder of the draft for value. Four of the nine justices of the court dissented, but the author of A. L. R. says the majority opinion is in line with the preponderance and prevailing authority in the United States on the subject.

According to the majority opinion, if a bank takes a check or sight draft from a customer, nominally for collection, and gives the customer immediate credit for it as cash, and the customer checks out the entire amount before the payment of the check is stopped, the bank will be regarded as a purchaser of the draft in due course and for value, as the result of an implied agreement to that effect, with right to compel the drawer to pay it, even though there was no consideration, as between the drawer and the drawee and though the bank could have, as a matter of law, charged the draft back against the drawer if his account had been sufficient for the purpose.

Charles D. Scott vs. W. H. McIntyre Co., City National Bank of Auburn, interpleader, decided by the Supreme Court of Kansas, L. R. A. 1915-D, extensively quoted in intervenor's brief, is also almost exactly like the case we have in hand. The syllabus reads in part:

"Where a draft, with bill of lading attached, is delivered to the bank in whose favor it is drawn, which forwards it to a correspondent for collection, and gives immediate credit to the depositor, the proceeds while in the hands of the correspondent bank, are to be regarded as belonging to the payee named in the draft, as against a creditor of the depositor who attempts to reach them by garnishment, after the account as increased by the deposit has been overdrawn, and this notwithstanding the practice of the first named bank, to charge its depositor interest on such items from the time of giving credit, until the proceeds are actually received and to charge back the amount in the event of non-payment and notwithstanding that a serial number was placed on the draft by the original bank, in sending it out for collection and that a witness testified to a general practice of bankers to place such numbers on items received for collection, but not upon those received as cash."

In that case it appears that W. H. McIntyre Co. drew a draft with bill of lading attached on Scott, in favor of City National Bank of Auburn. The draft was drawn for collection, but was deposited in Bank of Topeka as cash. McIntyre Co. received immediate credit and checked the credit out, their account being overdrawn at the time and continued to be for some time thereafter. Scott, a creditor of McIntyre Co., paid the draft to Bank of Topeka and then immediately seized the proceeds in the hands of Bank of Topeka, upon which Bank of Auburn, Indiana, intervened, claiming the proceeds. The case involved the right to charge interest on the credit until the draft was paid and the right to charge it back, if it was not paid. The Kansas court, citing authorities, held that the Bank of Auburn was the owner and possessor of the draft, the result of a purchase by implication, the consent of McIntyre Co. to sell and that of Bank of Auburn to buy, being shown by the deposit as cash, accompanied by possession and the immediate receipt of the price by checking it out.

In the case we have in hand, the ownership of the draft and bill of lading and the delivery of the same, results from the understanding and dealings between Bank of Topeka and Shawnee Milling Co. in Kansas. The proceeds of the draft, answering to the deposit and credit given, were checked out on the day the same was received. The drawer and payee having dealt with each other in Kansas, the rights of the payee are fixed by the law of that state. Civil Code of Louisiana, Art. 10. The law of Kansas not having been proven, will be presumed to like our own. The deposit slip in this case, shows that the draft in question was deposited by Shawnee Milling Co. in Bank of Topeka as cash on June 27, 1924, and was checked out the same day. According to our law on the subject, Act 64 of 1904, Sections 25 and 26, Bank of Topeka gave value for the draft. Under Section 52, clause 3 and 4, it was a holder in due course.

The proposition as well as the assent to a contract, may be express or implied. Civil Code, Art. 1811. To receive goods from a merchant without an express promise and to use them, implies a contract to pay the value, creates a sale by implication, Civil Code, Art. 1816. All of the essential elements of a sale, exist in this case, Civil Code, Arts. 2439 and 2456. The delivery of a draft may take place by the use made of it by the party receiving it, with the consent of the party from whom it was obtained, Civil Code, Art. 2481.

As between the Shawnee Milling Co. and Bank of Topeka, if Shawnee Milling Co. had vested in Bank of Topeka all their right, title and interest in and to the draft at Topeka and before it reached the drawee at Baton Rouge, and we now hold that they had done so, it follows that Holmes & Barnes, Ltd., have no right to take the proceeds from Bank of Topeka and have same applied to the payment of the amount due it by its said debtor.

The decree of this court heretofore entered in this case is now set aside; the judgment appealed from is annulled, avoided and reversed and judgment rendered in favor of Bank of Topeka, intervenor, as prayed for in its petition. It is further ordered that the sheriff of the Parish of East Baton Rouge and Louisiana National Bank of Baton Rouge, restore the proceeds of the draft in question to Bank of Topeka and that the plaintiff Holmes & Barnes, Ltd., pay the cost in both courts.

LECHE, J.　Concurring.

In my opinion, the only question in this case is one of fact, and that is, did the

money seized by Holmes & Barnes belong at the time of the seizure to the Shawnee Milling Co., defendant, or to the Bank of Topeka, the intervenor?

That fact can only be ascertained by seeking from the other facts in the record, what the real intention of the Shawnee Milling Co. and of the Bank of Topeka, was, at the time the draft was deposited by the former with the latter.

Admitting, if there is any doubt about it, that the draft when drawn, was to be deposited for collection, as stated on its face, the fact nevertheless appears that it was the cusom of the milling company as soon as it deposited such a draft and before the draft was collected, to draw checks on the Bank of Topeka in anticipation of the collection of the draft, and that the Bank of Topeka on receiving such draft would credit the amount thereof to the milling company, subject to the ·condition that the milling company would pay collection charges and interest to the time of collection, and that if such draft was uncollected, it should be charged back to the milling company. On the other hand, if such draft was paid, interest charges would then stop and the proceeds become the property of the bank, and that is precisely what took place in this case.

Although the Bank of Topeka may have had possession and custody merely as pledgee or as conditional owner of the draft for the money it advanced on it to the milling company up to the time of collection, yet when the draft was paid, the proceeds belonged in full ownership to the Bank of Topeka. In my opinion that was .the real intention of the parties, and that intention should be recognized and carried out.

MOUTON, J.    Dissenting.

Defendant, the Shawnee Milling Co., drew a sight draft on Holmes & Barnes, Ltd., for one thousand seventy-five dollars, payable to the order of the Bank of Topeka. After stating, pay to the order of the Bank of Topeka, the draft reads "for collection".

Holmes & Barnes paid the draft to the National Bank of Baton Rouge to which it had been sent for collection by the Bank of Topeka. The amount of one thousand and seventy-five dollars collected on the draft by the Bank of Baton Rouge, was garnisheed by Holmes & Barnes, payee, under a judgment it had obtained against the Shawnee Milling Co., for flour, the latter had failed to deliver to Holmes & Barnes.

The Bank of Topeka intervened in the garnishment proceedings, claiming to be the owner of the one thousand and seventy-five dollars which had been attached in the hands of the National Bank of Baton Rouge by Holmes & Barnes under the judgment it had obtained against the Shawnee Milling Co. The Bank of Topeka, intervenor, is claiming this sum of one thousand and seventy-five dollars, proceeds realized on the draft, as purchaser of the draft from the Shawnee Milling Co. The burden of proof is therefore on the Bank of Topeka to show that it acquired title to the draft, as owner, by sale, exchange, or other contract transmissive of title. In order that we may properly determine what was the nature of the contract between the milling company and the Bank of Topeka it is necessary for us to ascertain from the facts and circumstances of the case what was the intention of the parties in entering into the agreement in reference to the draft in question, or as to whether or not after

the contract had been entered into, it was negative, altered or modified by a subsequent understanding passing title to the Bank of Topeka. .

The proof shows that the Shawnee Milling Co. was a regular customer of the Bank of Topeka and had been dealing with it for quite a while. The fact is that the Shawnee Milling Co. had a large overdrawn account with the bank. The book-keeper of the Shawnee Milling Co., Mr. Tally, was the party who deposited the draft in question with the Bank of Topeka. He says, it was credited by the bank to the account of the milling company. He says, on cross-examination, that all such drafts were deposited to the account of his company, and that in such cases, he drew checks in favor of the bank in which he included the amount due the bank for collection and interest. He testified also that the draft in question was handled by the bank as similar drafts had been previously handled by it. He explains that the proceeds of the drafts he deposited, on all occasions, were credited to the account of the Shawnee Milling Co.; that this account was used as a checking account against which the milling company drew its checks. The foregoing testimony shows that the bank had established a running account with the milling company and which the record shows had been largely overdrawn. There is no proof whatsoever to indicate in the instant case that the bank was acquiring the draft as a purchaser. The testimony does not support this contention. The draft was simply turned over to the bank by the milling company in the usual course of dealing which had been established between them. The cashier of the bank says that the words "for collection" which appear on the face of the draft were inadvertently left there in the printed blank.

He says, these words are sometimes striken out, but that in this instance they were not. If a special agreement had been made in this case by which the bank had acquired the note as purchaser or otherwise, it occurs to us that the words referred to would have been erased or striken out of the draft.

The cashier of the bank testifies that the amount of the draft was credited to the account of the Shawnee Milling Co. The tellers of the bank testify practically to the same effect. The bank contends that by thus crediting the amount of the draft to the account of the Shawnee Milling Co., it became the purchaser of the draft and was entitled to the ownership of its proceeds. The cashier explains that the credit was given the milling company in the usual course of the banking business by deposit slip, in which appears the deposit of one thousand seventy-five dollars, the amount of the draft, and which was credited to the account of the milling company. We find, however, at the foot of the deposit slip, in print, the significant words following: "Checks lost in transit, or on which payment is refused, will be charged back to the depositor's account, this bank acting only as agent and assuming no responsibility beyond due diligence on its part." It may be that the words "for collection", which appear in the draft were inadverently left there as explained by the cashier, but the language used in the foot note of the deposit slip is clear and leaves no doubt but that the bank in accepting the draft was acting as agent, only. It is impossible, unless we do violence to this language, to say that the bank was acting as a purchaser of the draft when it applied the deposit to the credit of the Shawnee Milling Co. At the time this deposit was so applied it is unquestionably true that the Shawnee Mill-

ing Co. was then the owner unless we eviscerate from the deposit slip the emphatic declaration that the bank was acting as agent only, and did not assume any other responsibility in handling the draft. Not only this, but we would also have to accept the explanation of the cashier of the bank that the words "for colletcion" found in the draft had been left there inadvertently. The proof is that the Shawnee Milling Co., subsequent to the deposit and the application thereof to the credit of the milling company on the books of the bank, drew for an amount in excess of the deposit. If the bank had not placed the restrictions as to its handling of the draft above pointed out, the fact that it had honored the check of the milling company to the amount of the deposit or in excess thereof, it might upon that fact be contended by intervenor that the bank had acquired the check for value, thus establishing its title thereto as owner. Even, if the bank had merely reserved the right of charging to the account of the depositor the amount of the draft in case of its loss or refusal of payment, counsel for mover might with show of authority under some of the decisions cited by him, claim that the bank had parted with its money to the amount of the draft in favor of the milling company and was therefore a holder for value. There would be in such a situation, legal ground for that contention.

In the instant case, however, the restrictions go further as we find in the draft in question the words "for collection"; also in the deposit slip the reservation of the right of the bank to charge back to the account of the milling company the amount of the deposit in the event of the loss of the draft or its payment refused, and we must also bear in mind that we have in this case in addition thereto this signi-

ficant condition, namely, "this bank is acting only as agent and is assuming no responsibility beyond due diligence on its part". It is stated there, clearly, beyond cavil or question, that the bank was acting as agent, only. At that time the deposit had been received and had been applied to the credit of the Shawnee Milling Co., still the bank proceeds to say we are acting in this transaction only in the capacity of agent. Not satisfied with this clear declaration, the bank says further in its reservation, we assume no responsibility beyond due diligence. Obviously, there is not the slightest claim to ownership in such language as this. What is the meaning of the words "no responsibility beyond due diligence on the part of the bank". Evidently, diligence in the collection of a draft as agent, for it is impossible to believe that such an expression as this would have been employed by the bank, if it had considered itself as owner, or vested with title to the draft.

The evidence shows that the Shawnee Milling Co., after making the deposit, continued to draw on the bank, and that in these drawings the amount of the draft was included. As a matter of fact, the record shows, that the overdrawn account of the milling company with the bank continued to increase as time wore on. As explained by the cashier, the various deposits made by the milling company were used as a check account by that company. The bank simply honored its checks when they were drawn against this account without requiring that the checks should be applied to any specific deposit. In this case it is certain that there was no special understanding that the milling company would draw against the deposit made to its credit for the draft in question as an amount the bank had paid to acquire title as a purchaser or otherwise.

The record, therefore, lacks proof that it was the intention of the milling company to sell or to part with its ownership in the draft or that the bank intended to acquire title thereo. It is universally recognized as an elementary principle that in all contracts, in those of sales, exchange, or pledge as well, the intention of the parties is the dominant, determining and controlling factor. There was no intention to sell here on the part of the milling company and no intention to buy by the bank, and there is no proof to show that by any agreement or understanding subsequent to the original contract as hereinabove explained, that the relations between the parties were changed or modified so as to operate a transfer of title to the bank.

Counsel for mover contends that the bank is entitled to the proceeds of the draft as pledgee. In its petition the bank claims these proceeds as owner, only. There is no proof whatsoever to indicate in the slightest that the draft had been pledged to the bank by the milling company. In the absence of either averment or proof in the record that the parties ever intended to enter into a contract of pledge, we find no grounds to support the contention of the bank in that respect.

Holmes & Barnes, plaintiff, complains that in our original opinion we modified the judgment appealed from by disallowing attorney's fees which had been decreed below against the defendant. In this respect complainant is correct as defendant did not appeal nor file an answer to the appeal asking the disallowance of attorney's fees. That part of our decree disallowing this item should therefore be set aside.

For the foregoing reasons, I hereby dissent and am of the opinion that the original judgment should be reinstated with the exception of the item set aside as above decreed.